ADAM GORDON
United States Attorney
JOSHUA C. MELLOR
California Bar No. 255870
ASHLEY E. GOFF
California Bar No. 299737
PETER S. HORN
California Bar No. 321358
New York Bar No. 5333653
Assistant U.S. Attorneys
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel: 619-546-9733/9735/6795
joshua.mellor@usdoj.gov
ashley.goff@usdoj.gov
peter.horn@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTONIO QUINONES (2),<br>    aka "Tony,"<br>    aka "T,"<br>JOVANNY ENRIQUEZ (3),<br>    aka "Gio,"<br>    aka "Maniac,"<br>    aka "@parkside.finest,"<br>    aka "@parkside.general,"<br><br>Defendants. | Criminal Case No. 26cr402-TWR<br><br>**THE UNITED STATES' MOTION TO DETAIN DEFENDANTS QUINONES AND ENRIQUEZ AS RISKS OF FLIGHT AND DANGER TO THE COMMUNITY** |

These defendants are members and associates of the Sinaloa Cartel and Mexican Mafia who worked with associates of these criminal organizations, to try to murder a cartel target

(Victim 1) in Chula Vista in March 2024. They are responsible for stalking Victim 1, Victim 1's wife, and Victim 1's young child throughout San Diego, setting Victim 1 up with a truck equipped with tracking, and attempting to execute the hit on Victim 1 twice in a 24-hour period. Defendants Quinones and Enriquez played critical roles in bringing that Sinaloa Cartel violence north of the border into the United States through the use of Mexican Mafia and sureños gang members. Appropriately, their guideline ranges are life in prison. They pose a serious risk of flight and danger to the community and should be detained.

The United States will also seek to detain codefendant Poly Antunez (defendant 1), who likewise played an critical role, but does not include him in the present written motion because he is already detained in this district related to his drug trafficking activity in Case No. 23cr2349-AGS and is pending sentence in that case on charges that would not legally permit his release.

## I.     DEFENDANTS' CONSPIRACY TO KILL A SINALOA CARTEL TARGET

### A.     Background of Offense Conduct

Quinones, Enriquez, and Antunez are charged in an indictment with conspiracy to commit VICAR murder, two counts of VICAR attempt murder, two counts of VICAR assault with a dangerous weapon, conspiracy to commit murder for hire, and use of interstate facilities in the commission of a murder for hire. Because of the nature of the offense, the United States includes sufficient facts to support its detention arguments herein but does not include all facts known to it and reserves the right to orally add additional facts at the time of any detention hearing.

It was widely reported that, in November 2023, the Cartel Arellano Felix ("CAF") stole a massive drug load from the Sinaloa Cartel (the "Cartel") in Tijuana, Mexico. The fallout in Tijuana was immediate. There appeared to be rampant retaliatory murders on CAF members and Tijuana law enforcement. Seeking retribution for the stolen load, the Cartel placed a hit on individuals the Cartel viewed as responsible and people associated with them, including Victim 1. The Cartel first attempted to kill Victim 1 in December 2023 at Victim 1's home in Tijuana. Victim 1 fled to the United States. Undeterred, the

Cartel began using its contacts in San Diego to stalk Victim 1 within the Southern District of California. Among those contacts were defendants Antunez and Quinones. Antunez and Quinones worked together to find Victim 1's home address (for example, Antunez ran multiple Truthfinder searches) and to foster an ongoing relationship with Victim 1 to set Victim 1 up to be murdered by the Cartel's hitmen.

The Cartel simultaneously used associates in the Mexican Mafia and Westside Wilmas (the "Wilmas") (a sureños gang) to hire hitmen to complete the job. Enriquez had just turned 18 years old, ran the Wilmas juvenile members, and coordinated with Mexican Mafia associates and Wilmas members, including Ricardo Sanchez, to have two juvenile Wilmas members—Nunez and Quintero—be paid to commit the job. The benefit to him was clear in messages—Enriquez would be paid part of the money Nunez and Quintero would receive and it would elevate his position as a Mexican Mafia and Sinaloa Cartel associate. The reason Enriquez chose Nunez and Quintero was evident in messages—Nunez and Quintero were only 15 years old at the time of the offenses, and they were all aware that, under California State law, there was *no possibility* of them being treated as adults if prosecuted in California State court. The Wilmas' knowledge of that law and brazen attempt to use it to avoid true responsibility for these attempted murders and others was striking. Enriquez was a critical Wilmas point of contact because, in his own words from the day of the charged attempted murders: "ima run the hood soon. Watch. I promise yall, Give me 3 years. But they told me **i run the youngsters."** Enriquez worked directly with other



Sanchez – Nunez – Enriquez - Quintero

coconspirators and Sanchez to coordinate Nunez and Quintero's role as hired hitmen.

In December 2025, Nunez and Quintero both pleaded guilty to one count of VICAR murder and two counts of VICAR attempted murder for their role in the offenses, and they

are pending sentencing. *United States v. Nunez*, 25cr4822-TWR (related to this case, 26cr402-TWR).

**B.    Preparation to Kill Victim 1**

In advance of the hit, phone records show that Enriquez was in direct communication with a high-ranking associate of the Mexican Mafia and introduced that individual to one of the teen hitmen. On March 25, 2024, the time came for the hit. Enriquez immediately activated Nunez and Quintero:

| @parkside.finest [Enriquez] | SOSS |
| --- | --- |
| | @shooter.whp [Nunez] |
| | SOSS |
| | @bkdumper [Quintero] |
| | Ima pick u up shooter [Nunez] |
| | So u be at the same spot as dumper [Quintero] |
| | WYA shooter [Nunez] |
| | Hurry up |
| | I gotta call |
| | Wya |
| Other messages trying to get ahold of Quintero and Nunez | |
| @parkside.finest [Enriquez] | Spam call his number |
| | Im trynna wake up dumper [Quintero] |
| | Just know |
| | We gone be rich |
| | If any happens |
| | We love yall |
| Other WSW associate accounts | Wow |
| | Bru u guys are gonna do some stupid shit |
| @parkside.finest [Enriquez] | We all getting new cars new chains new toys |
| Other WSW associate accounts | Be safe guys |
| | I don't wanna lose my friends – I need u guys |
| **Other WSW associate account** | **U guys hitmans now or what** |
| **@mr.187onaoppk [Quintero]** | **Basically** |
| Other accounts | Anw |
| | Don't die |
| | Come back in one piece |

At that same time, Quinones began trying to rent an AirBnB for that night through March 27, 2024 for Nunez and Quintero to stay at. Specifically, Quinones sent messages that he wanted an AirBnB "wherever by Chula Vista," which is the area of San Diego where both attempted murder events ultimately occurred. Quinones was unsuccessful in securing an AirBnB, so codefendant Antunez arranged to rent an AirBnB for the hitmen.

Later that night, Nunez and Quintero arrived at the AirBnB, and Quinones and Antunez met them at the AirBnB. Later in the evening, Nunez, Quintero, Quinones, and Antunez drove around various parts of San Digo in Quinones' black Audi. Shortly after 2:00 a.m., Antunez, Quinones, Nunez, and Quintero once again left the AirBnB to deliver a Ram TRX to Victim 1. Surveillance footage that night shows Antunez delivering the TRX to Victim 1 then getting into the black Audi driven by Quinones and driving away.

### C.    First Attempt on Victim 1—Evening of March 26, 2024

Throughout the next day (March 26, 2024), cell site data and license plate readers show that Quinones, Nunez, and Quintero, stalked Victim 1 throughout San Ysidro and Chula Vista. Tolls show that Quinones and Nunez were in consistent communication as they tracked Victim 1, exchanging approximately 64 calls and texts up until 8:51 p.m., which is one minute before dispatch received the call that Victim 1 was shot.

Enriquez also continued to check in on the progress: @parkside.finest [Enriquez]: "U good?"; @shooter.whp [Nunez]: "Yeah"; @parkside.finest [Enriquez]: "Going how you thought?"; @shooter.whp [Nunez]: "Kinda."

Just before 9 p.m., as Victim 1 and his family were leaving a Chili's in Chula Vista, Quintero and Nunez pulled up behind them in the parking lot. Quinones was in the immediate vicinity watching over them. Quintero got out of the car and fired a single bullet that struck Victim 1's legs. After that single shot, Quintero's gun jammed, and he was unable to unjam the weapon in time to shoot Victim 1 again. Quintero got back into the car Nunez was driving, and Nunez attempted unsuccessfully to hit and kill Victim 1 with the vehicle. Quintero and Nunez then fled the scene, immediately calling Quinones.

### D.    Second Attempt—Early Hours of March 27, 2024

Antunez, Quinones, Nunez, and Quintero all met back at the AirBnB. Toll data confirms a lengthy call to a Mexican phone number. Ultimately, the result of those calls was that a Wilmas adult (Sanchez) would join Nunez and Quintero with more guns, and that the Cartel would increase the payment for the hitmen to finish the job. Enriquez remained in consistent coordination with Nunez:

| @shooter.whp [Nunez] | Foo [message liked by parkside.finest] |
| --- | --- |
| | We getting 50band ages |
| | Bandages [$50,000] |
| | * |
| | each |
| @parkside.finest [Enriquez] | Oh serio? |
| | 50? |
| @shooter.whp [Nunez] | yupp |
| | Each if we get it done tn [message liked] |
| @parkside.finest [Enriquez] | Fasho |
| | But there another guy added? Or no |
| | ? |
| @shooter.whp [Nunez] | Js me R[ichie Sanchez] and D[umper (Quintero)] |
| @parkside.finest [Enriquez] | Fuck n** |
| | I shudve gone |
| | But that foo lagged it thought he flaked |
| | Yall got enough toy [guns] |
| | ? |
| @shooter.whp [Nunez] | 4 |
| | Toys [guns] |
| | 1 of em jam |
| @parkside.finest [Enriquez] | So 3 good huh |
| | So 150k total? |
| @shooter.whp [Nunez] | yupp |
| @parkside.finest [Enriquez] | That right west side |
| @shooter.whp [Nunez] | Big boy moves |
| @parkside.finest [Enriquez] | Hell yea west |
| @shooter.whp [Nunez] | I told u ws |
| @parkside.finest [Enriquez] | Im just not that young anymore yk [Enriquez was approximately three months past his 18th birthday at the time] |
| @shooter.whp [Nunez] | Ill buy you a new phone west |
| @parkside.finest [Enriquez] | R[icardo Sanchez] just risking his life like a mf |
| @shooter.whp [Nunez] | yee |
| @parkside.finest [Enriquez] | U still got me with the 5k? |
| @shooter.whp [Nunez] | yeah |

*Motion to Detain*

6

In the early hours of March 27, 2024, the teen hitmen showed up at the intended victim's home to finish the job. They were joined this time by an older accomplice, 28-year-old Ricardo Sanchez. Each gang member expected to be paid approximately $50,000. The trio approached Victim 1's home, carrying at least one firearm apiece (see image right).



Victim 1's family (including Victim 2 and Victim 3, a minor) and friend (Victim 4) were present in the home. Sanchez banged on the front door, and once Victim 4 responded, Quintero and Nunez shot at Victim 4 and fired indiscriminately at Victim 1's family home, trying to kill anybody inside. Victim 4 was shot in the hand, arm, and face by Quintero and Nunez, but he survived. In response to Quintero and Nunez's actions, Victim 4 shot toward Nunez, Quintero, and Sanchez to protect himself and the others within the home and, in so doing, killed Sanchez. After that, Nunez and Quintero fled the scene, calling Quinones for help and ultimately being arrested.

Later that morning (March 27, 2024), before news reports confirmed who died, the Audi used by Antunez and Quinones was caught on a license plate reader driving a block away from Victim 1's Apartment.

### E.    May 2024 Arrests of Antunez and Quinones

On May 8, 2024, federal law enforcement executed a search warrant on Antunez's home. Antunez was placed under arrest based on charges in a separate case pending in this district (No. 23cr2349-AGS-1). Quinones was also found outside Antunez's home in a stolen Jeep that was positioned in a location that appeared intended as a lookout; inside the vehicle with Quinones were four cellphones, a bag of 9mm ammunition, $7,901 USD, and an electronic surveillance equipment detector. Quinones was placed under arrest based on

his state probation conditions and subsequently charged and arrested federally for being a felon in possession of ammunition in another case in this district (No. 24cr1069-AGS).

In the days leading up to the arrest, federal law enforcement had observed Antunez traveling as a passenger in the Jeep Quinones was in at the time of arrest. Officers also noticed that on multiple occasions, Quinones would wait in the Jeep in front of Antunez's residence, and not leave until Antunez left. Once Antunez left, Quinones would closely follow Antunez's vehicle. Officers knew Antunez had a history of having security and/or lookouts for law enforcement and other individuals, and suspected Quinones was acting in this capacity.

In the home that Antunez and Quinones were at, law enforcement also found a tracker matching others used related to Victim 1's attempted murders and significant Sinaloa Cartel paraphernalia. For example:



Antunez has since pleaded guilty to the charges in his unrelated federal case, as has Quinones. Quinones was on federal supervised release at the time of his arrest on the current charges. Based on law enforcement data in this case, he was actively lying to probation regarding his whereabouts, among other things.

## II.    LEGAL PRINCIPLES

The Bail Reform Act authorizes and sets forth the procedures for a judicial officer to detain a person, pending trial, sentence, and appeal. 18 U.S.C. §§ 3141-3150. The Act

requires the court to order a defendant detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required…" 18 U.S.C. § 3142(e); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). The court has a duty to engage in a two-step inquiry before ordering a defendant to be detained pending trial. *See, e.g., United States v. Hollender*, 162 F.Supp.2d 261, 264 (S.D.N.Y. 2001); 18 U.S.C. § 3142(b) and (e). First, the court must make a finding as to whether the defendant presents a "serious risk that such person will flee" if not detained. *Id.* at § 3142(f)(2)(A). Second, if the defendant is likely to flee, the court "must determine whether some set of conditions would sufficiently vitiate that risk." *Hollender*, 162 F.Supp.2d at 264; 18 U.S.C. § 3142(g).

The court will consider the factors set forth in § 3142(g), such as: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance to court proceedings; and (4) the nature and seriousness of the danger to any person or community that would be posed by the person's release.

The United States must establish the defendant is a risk of flight by a preponderance of the evidence, *Motamedi*, 767 F.2d at 1405, and that defendant is a danger to the community by clear and convincing evidence, *Reynolds*, 956 F.2d at 192.

## III.    QUINONES SHOULD BE DETAINED PENDING TRIAL
### A.    QUINONES PRESENTS A SERIOUS RISK OF FLIGHT

There is no rebuttable presumption in this case based upon the charges in the Indictment. Nevertheless, the preponderance of the evidence below supports a finding that Quinones is a risk of flight and a danger to the community, and he should be detained on these bases.

//

*Motion to Detain*

9

### 1.    Nature and Circumstances of the Offenses Support Detention

As described above, Quinones was part of a plot to execute a cartel hit on U.S. soil. He was a hands on participant as the hitmen travelled to San Diego, he and Antunez set up Victim 1 with a tainted a vehicle, he stalked the victim with hitmen, he was the hitmen's primary point of contact, he watched over the hitmen as they attempted to kill Victim 1, and he regrouped with them before they went on a second attempt. Accordingly, he not only participated in the scheme, but he directed the actions of others to unleash cartel violence in a suburban strip mall and complex of family homes. There are few, if any, crimes more serious.

Quinones's sentencing exposure underscores the seriousness of the offense. Even if Quinones pleads guilty to the current charges and accepts responsibility, the applicable guidelines range would be:

| | |
|---|---|
| Base Offense Level (2E1.3/2E1.4, 2A1.5/2A2.1) | 33 |
| Permanent/Life Threatening Injury (2A2.1(b)(1)(B)) | +4 |
| Offer/Receipt of Pecuniary Value (2A2.1(b)(2)) | +4 |
| Organizer/Leader §3B1.1(a) | +2 |
| Use of Minor §3B1.4 | +2 |
| Multiple Count Increase in Offense Level | +3 |
| Acceptance of Responsibility §3E1.1(b) | -3 |
| **Total Offense Level** | **45** |
| **Guidelines** | **life** |

In addition to the applicable guideline range, Quinones faces potential additional charges in advance of trial. Namely, as reflected by the guilty pleas of Nunez and Quintero, Quinones can be charged by the United States with aiding and abetting VICAR murder for the murder of R. Sanchez at the second hit. His sentencing enhancement for the Section 1958 offenses can also be increased to "resulting in death." The result of those additional charges would be that Quinones would face mandatory life imprison and potentially the death penalty.

Those potential penalties combined with the applicable guidelines create a powerful incentive to flee, and the foreign nature of the organization makes flight incredibly viable.

*See United States v. El-Gabrowny*, 35 F.3d 63, 65 (2d Cir. 1994) ("If convicted…defendant will face a probable very lengthy term of imprisonment" which "gives him a great incentive to flee."). The nature and circumstances of the offense are aggravated and weigh heavily in favor of detention.  Therefore, this factor weighs in favor of detention.

### 2.    The Weight of Evidence Supports Detention

This is the least important factor, *Gebro*, 948 F.2d at 1121, but the evidence is very strong and would give Quinones a powerful incentive to flee. As summarized above, the FBI has developed significant evidence against Quinones and his coconspirators including (but not limited to) phone downloads from multiple arrested coconspirators, encrypted communications, Facebook and Instagram communications, cell site data, videos, pictures, and travel records. Two conspirators have also already pleaded guilty to VICAR murder of R. Sanchez and VICAR attempt murder for Victim 1 and Victim 4. The United States can place Quinones as a key, on-the-ground operator of the hit, tracking Victim 1 and his family prior to the hit and on the critical days when the attempts were made both through concrete circumstantial evidence and Quinones' own statements in messages sent to and from individuals he coordinated with.

In sum, the evidence against Quinones is overwhelming, and he has the incentive and ability to flee. This factor weighs in favor of detention.

### 3.    The History and Characteristics of Quinones Support Detention

The Bail Reform Act directs courts to consider a wide range of factors under the heading "history and characteristics of the person." Among those are many factors that bear upon whether a defendant is a flight risk, including "family ties," "employment," "financial resources," "length of residence in the community," "community ties," "criminal record," and "record concerning appearance at court proceedings." *See* 18 U.S.C. § 3142(g)(3).

**i.    Character:** Quinones's character likewise weighs in favor of detention. Quinones organized a Sinaloa Cartel hit in San Diego. He is responsible for the stalking of Victim 1, for Victim 1's attempted murder, and for Victim 4's attempted murder in a fashion that unleashed gunfire in a suburban parking lot and home complex within this

district as a child stood feet away from the first round of gunfire and hid in the bathroom for the second. This offense was not out of character for him. Quinones has a history of firearm offenses and reckless alcohol-related activity that placed the public at risk of harm. He was also actively making misrepresentations to his federal probation officer at the time of this offense. Quinones' character establishes this was not aberrant behavior and he should be detained.

**ii.    Physical and Mental Condition:** Quinones has no notable physical or mental health conditions that would weigh on his ability to make court appearances. This factor is therefore neutral.

**iii.    Family Ties:** Quinones's family ties support detention. As documented in his 2025 sentencing memorandum, Quinones had a fractured childhood in which he never met his father, was raised partially by his grandparents (who are now deceased) and without his other two siblings consistently in the same homes. Quinones also has a five-year-old son. Quinones' mom lives in Tijuana, and Quinones himself received permission to live in Tijuana from probation at the time of his arrest in this case. Quinones' sister also does not live in the district and is in Illinois. Quinones does have a young child in San Diego but given his request to reside in Tijuana and ability for family to take the child to visit Quinones across the border, that single family point of contact is not sufficient to ensure his appearance at trial given the nature of the charges he faces and the fact that he has not even been able to find stable residence in San Diego.  In sum, Quinones has family ties in San Diego, but they are weak. This factor weighs in favor of detention.

**iv.    Employment:** Defendant lacks stable employment. Prior to his 2024 arrest, Quinones claimed to work part-time construction related jobs of unknown companies in San Diego. His lack of stable employment also weighs in favor of detention.

**v.    Financial Resources:** At the time of this filing, the government does not have information regarding Quinones's financial resources that would weigh on his ability to make court appearances. This factor is therefore neutral at this time.

//

*Motion to Detain*

**vi.**　　　**Length of Residence in the Community/Community Ties:**　Quinones was born in Oceanside. However, Quinones's mother lives in Mexico and does not have status to come to the United States. Quinones resided in Mexico for years until state probation required him to stay out of Mexico. At that point, Quinones was transient in the United States. At the time of his arrest in this case, he had sought and obtained permission to live in Mexico. Accordingly, while he previously had strong ties to the community, he now has strong ties to Mexico and also is transient within the community, making monitoring him and his compliance difficult even within the United States. (According to an associate who dropped Quinones off at his probation meeting on 2/11/2025, Quinones lives a homeless lifestyle and occasionally sleeps on his couch in National City.) Accordingly, this factor weighs in favor of detention.

**vii.**　　　**History Relating to Drug or Alcohol Abuse:** As evidenced in his criminal history below as well as a review of his phones, Quinones appears to have a significant issue with alcohol that has placed him and members of the community in danger. Moreover, several of his alcohol-related incidents occurred while on court supervision. This factor supports detention.

**viii.**　　　**Past Conduct/Criminal History:**　Quinones has a history of firearm possession and the commission of serious offenses while on probation, including committing the currently charged violent felonies while on probation for the illegal possession of an assault weapon, all of which indicate a continuing lack of respect for court orders and evidencing the danger he poses to the community.

| 7/8/2024 | SDCA | Felon in Possession of Ammunition | 8 months' custody, 3 years supervised release |
| --- | --- | --- | --- |
| 8/24/2023 | SD Superior | Illegal Possession of An Assault Weapon | 1 day jail, 2 years' probation<br><br>11/8/2024 – Probation Revoked |
| 03/31/2019 | SD Superior | DUI Alcohol | 5 years' probation<br><br>6/20/2019 - FTA |

*Motion to Detain*

13

| 6/12/2017 | SD Superior | Driving w/o license; Driving w/o Lights; Failure to Display Proof of Financial Responsibility | Fine imposed 9/11/19 – FTA/FTP |
| 04/28/2017 | SD Superior | Disregard Safety: Evade Police | 33 days jail, 2 years' probation |

Notably, the 2023 conviction for Possession of an Assault Weapon was related to Quinones being present at Antunez and his family's tire shop, which was used for a variety of criminal conduct. Law enforcement responded to multiple calls of firearms being discharged and observed Quinones concealing an unserialized AR-15 style rifle while trying to take it to a vehicle. Officers later encountered Quinones in a car with an individual named Roman Soto, who likewise trafficked drugs with Antunez (and pleaded guilty in 23cr2349-AGS). Surveillance footage also revealed Quinones with another individual as the individual threw a bag over the fence of the tire shop into a neighboring property; a search of the neighboring property revealed that bag contained a loaded, unregistered, serialized, Glock 19 handgun; a loaded, unregistered, serialized Taurus 9mm handgun; a loaded, unregistered .40 caliber handgun, and a loaded 9mm ghost gun with no serial number.

In addition to the above criminal convictions, Quinones has the following arrests:

- 2017: Disorderly conduct: alcohol. Quinones was found passed out in the driver's seat of a vehicle.

- 2017: Alien smuggling

- 2018: Speeding and driving without a license

- 2018: DUI

- 2019: Driving without a license

- 2022: Driving while license suspended for a DUI and Driving in excess of 100 mph.

  o *Between December 22 and August 2023, Quinones Failed to Appear at his arraignment and readiness conferences

- May 2024: Driving while license suspended for DUI and driving in excess of 100 mph

His past conduct and criminal history support detention.

**ix.     Record Concerning Appearance at Court Proceedings and on Probation, Parole, or Other Release:** As evidenced by the above criminal history, Quinones has a pattern of failing to appear and violating probation, including committing new criminal offenses while on probation. Additionally, while on his current term of supervised release, the United States believes Quinones reengaged in criminal conduct and knows that he was actively lying to his probation officer regarding his whereabouts. Additionally, while on supervised release at the time of this arrest, he was using a secondary burner phone unknown to probation.

The factors set forth in § 3142(g) strongly support a finding that Quinones is a risk of flight. Thus, the court should issue an order of detention on this basis.

**B.     QUINONES PRESENTS A DANGER TO THE COMMUNITY**

In addition to being a serious flight risk, there is clear and convincing evidence that Quinones poses a danger to the community.  This conspiracy involved planning and targeting an individual on U.S. soil to murder that victim on behalf of a well-known violent cartel. Quinones wasn't tangentially involved. He helped Antunez provide Victim 1 the vehicle, he then stalked Victim 1 throughout the day, and he shadowed the teen hitmen as they attempted the murder of Victim 1 on two occasions. Quinones' targeting of Victim 1 alone is sufficient to establish danger to the community, but his disregard for the lives beyond Victim 1 is further aggravating. Quinones, in stalking Victim 1 throughout the day on March 26, 2024, knew that Victim 1 was with his spouse and young child when Quinones continued to work with the hitmen to make their attempt. Quinones knew when the attempt was made at the Chili's that he was unleashing gunfire in a near-full suburban parking lot at a man standing next to his child. Just as Quinones' prior convictions evidence a lack of care for the safety of the community, Quinones didn't care about a spouse, child, or the general public in this case either. And when Quinones participated in sending another

hit crew to Victim 1's house hours later, he didn't care about the neighboring condominiums or people inside the house, people like Victim 4 who were shot in the face, hand, and arm. And he knew that the provocative acts he participated in could result in return fire—the return fire that killed coconspirator Sanchez. Finally, his prior convictions evidence that he routinely has access to firearms, including ghost guns, allowing his tendency toward harmful conduct to turn deadly, as it did here. And he has proven time and time again that court orders mean nothing to him. In sum, there is clear and convincing evidence that Quinones poses a danger to the community and should be detained.

## IV.    ENRIQUEZ SHOULD BE DETAINED PENDING TRIAL

### A. ENRIQUEZ PRESENTS A SERIOUS RISK OF FLIGHT

There is no rebuttable presumption in this case based upon the charges in the Indictment. Nevertheless, the preponderance of the evidence below supports a finding that Enriquez is a risk of flight, and he should be detained on this basis.

#### 1. Nature and Circumstances of the Offenses Support Detention

As described above, Enriquez was part of a plot to execute a cartel hit on U.S. soil. He was a hands-on participant in coordinating with in-custody individuals, securing the hitmen, sending the hitmen to San Diego, and maintaining regularly communication with them as they tried to complete their job. Enriquez's role in conspiring to kill Victim 1 was vital to the success of the conspiracy, but it is also aggravated by the fact that he used his position as head of the "youngsters" to strategically use two 15-year-olds to complete the crime with the intent of having those violent actors be immune for full accountability under California law.

Enriquez's sentencing exposure underscores the seriousness of the offense. Even if Enriquez pleads guilty to the current charges and accepts responsibility, the applicable guidelines range is:

| | |
|---|---|
| Base Offense Level (2E1.3/2E1.4, 2A1.5/2A2.1) | 33 |
| Permanent/Life Threatening Injury (2A2.1(b)(1)(B)) | +4 |
| Offer/Receipt of Pecuniary Value (2A2.1(b)(2)) | +4 |
| Organizer/Leader §3B1.1(a) | +2 |

| Use of Minor §3B1.4 | +2 |
|---|---|
| Multiple Count Increase in Offense Level | +3 |
| Acceptance of Responsibility §3E1.1(b) | -3 |
| **Total Offense Level** | **45** |
| **Guidelines** | **life** |

In addition to the applicable guideline range, Enriquez faces potential additional charges in advance of trial. Namely, as reflected by the guilty pleas of Nunez and Quintero, Enriquez can be charged by the United States with VICAR murder for the murder of R. Sanchez at the second hit. His sentencing enhancement for the Section 1958 offenses can also be increased to "resulting in death." The result of those additional charges would be that Enriquez would face mandatory life imprison and potentially the death penalty.

Those potential penalties combined with the applicable guidelines create a powerful incentive to flee, and the foreign nature of the organization makes flight incredibly viable. *See United States v. El-Gabrowny*, 35 F.3d 63, 65 (2d Cir. 1994) ("If convicted . . . defendant will face a probable very lengthy term of imprisonment" which "gives him a great incentive to flee."). The nature and circumstances of the offense are aggravated and weigh heavily in favor of detention.  Therefore, this factor weighs in favor of detention.

## 2. __The Weight of Evidence Supports Detention__

"Of [the 3142(g)] factors, the weight of the evidence is the least important, and the statute neither requires nor permits a pretrial determination of guilt." *Gebro*, 948 F.2d at 1121.  In this case, the substantial evidence against Enriquez gives him a powerful incentive to flee. As summarized above, the FBI has significant evidence against Enriquez and his coconspirators including (but not limited to) phone downloads from multiple arrested coconspirators, encrypted communications, Facebook and Instagram communications, cell site data, videos, pictures, and travel records. Two conspirators have also already pleaded guilty to VICAR murder of R. Sanchez and VICAR attempt murder for Victim 1 and Victim 4. The United States can place Enriquez as a key coordinator of the hit who ran the Wilmas "youngsters" crew, facilitated Nunez and Quintero's role as hitmen, kept ongoing tabs on their progress during the events, and expected to be paid for

the part he played. In sum, the evidence against Enriquez is overwhelming, and he has the incentive and ability to flee. This factor weighs in favor of detention.

### 3. <u>The History and Characteristics of Quinones Support Detention</u>

**i.** **Character:** Enriquez's character likewise weighs in favor of detention. Enriquez organized finding hired, juvenile hitmen for the Sinaloa Cartel to murder Victim 1 in San Diego. This offense was not out of character for him, as evidenced by his criminal history below and his membership in the Wilmas (a well-known violent gang in Los Angeles), which is well documented by the tattoos on his body (e.g., "23," "WS," and "Park"), his social media accounts and his prior arrests. Enriquez's role in the Wilmas gang also speaks to his character. Enriquez's social media and iCloud accounts were filled with images of his gang activity, firearms, and drugs. As discussed above, there were also several messages in which he discusses running the Wilmas "youngsters" (meaning juveniles). In that capacity, he helped Nunez and Quintero commit the instant offense. Nunez and Quintero have social media messages about taking the fall for Enriquez on a separate attempted murder arrest since they are juveniles and Enriquez isn't, and he regularly displays drugs and firearms with the juveniles he works with. *See* images below. Those accounts also contained videos of Enriquez beating people, sometimes alongside other Wilmas members. For example, below is a still shot of Enriquez midair kicking a

//
//
//
//
//
//
//
//
//
//

man the Wilmas targeted:








Enriquez's concerning character was also evident at the time of his arrest as he told law enforcement he wished he'd been arrested at home where he could have run and had the cops try to kill him. He also verbally processed ways the transport vehicle could be broke to allow a detainee to run from law enforcement or attack officers driving. ENRIQUIEZ's character established he should be detained.

**ii.    Physical and Mental Condition:** At the time of this filing, the government does not have any information positive or negative regarding Enriquez's physical condition that would weigh on his ability to make court appearances. However, Enriquez's unstable mental condition is evident from his interactions with law enforcement at the time of this arrest and prior arrests. Enriquez consistently appears volatile in interactions with other

gang members and law enforcement with a tendency toward violence. For example, in addition to saying he wished he could have run from the cops at arrest he also pounded his head against the vehicle window, asked how he could get the death penalty for these offenses, and asked officers if they felt safe as he speculated that there were ways for detainees to gain access to them in the front of the vehicle. Enriquez's violent tendencies and volatility weigh in favor of detention.

**iii.    Family Ties:** The United States is not in possession of information regarding Enriquez's family ties. The United States is aware that he is a strongly embedded member of the Wilmas residing near Wilmington, California in the Central District of California and that, often, those gang members are closer than family for individuals in Enriquez's position. Accordingly, this factor likely weighs in favor of detention or is, at best, neutral.

**iv.    Employment:** Enriquez is believed to have been working as a construction worker at the time of his arrest. That relatively new, unestablished employment is not sufficient to secure his appearance at trial in light of the nature of the charges and won't ensure the safety of the community.

**v.    Financial Resources:** At the time of this filing, the government does not have any information regarding Enriquez's financial resources that would weigh on his ability to make court appearances. This factor is therefore neutral.

**vi.    Length of Residence in the Community/Community Ties:** Enriquez has no ties to the Southern District of California and his ties in the Central District are related to organizations that were involved in perpetrating this offense and many others. Accordingly, this factor weighs in favor of detention.

**vii.    History Relating to Drug or Alcohol Abuse:** At the time of this filing, the government does not have specific information regarding Enriquez's alcohol and drug use. However, social media evidence obtained shows Enriquez holding large qualities of marijuana alongside firearms with juvenile gang members. The United States also obtained significant evidence regarding his young gang members' habitual use of alcohol at Wilmas events and training on how to make hooch if they went into custody. Accordingly, the

*Motion to Detain*

United States believes that Enriquez is involved in ongoing drug and alcohol use and, as an involved member of a sureños gang, has a high likelihood of involvement in drug trafficking.

**viii.    Past Conduct / Criminal History:**  As discussed above, social media accounts and cloud-based search warrant confirms show Enriquez holding guns, distributable quantities of drugs, and beating homeless individuals, fellow Wilmas members (jumping them in) and rival gang members. Based on the United States' records, ERIQUEZ has had the following arrests and convictions:

| Date | Court | Charge | Custody |
|------|-------|--------|---------|
| 2/4/2025 | LA Superior | Evading Police Officer | Case Pending |
| 2/1/2025 | LA Superior | Carjacking | Case Pending |
| 3/3/2024 | LA Superior | Contributing to the Delinquency of Minor | Unknown |
| 2/26/2024 | LA Superior | Attempt Murder | Dismissed |
| 3/23/2023 | Kern County Sheriffs | Resisting Peace Officer | Unknown |
| 1/21/2022 | Unknown | Robbery – 1st Degree | Home Probation |
| 7/8/2021 | LA Superior | Assault with Deadly Weapon – Not Firearm; Battery | Detained Petition |
| 4/2/2021 | LA Superior | Minor Illegally Possessing Live Ammo | Handled Informally |
| 3/24/2021 | LA Superior | Threaten Crime with Intent to Terrorize | Juvenile Hall |
| 3/11/2021 | LA Superior | Minor Illegally Possessing Live Ammo | Handled Informally |

**ix.    Record Concerning Appearance at Court Proceedings and on Probation, Parole, or Other Release:** Based on his criminal record above, it is clear that Enriquez has no respect for the law. At the time of his arrest in this case, Enriquez also told law

enforcement officers that he (1) likes to run from the cops, and (2) had previously cut off an ankle bracelet. He also stated that he wished he had been arrested at his house (rather than at a traffic stop) because he would have run from the cops. Enriquez's express lack of desire to comply with law enforcement shows that no condition or combination of conditions would secure his release.

The factors set forth in § 3142(g) support a finding that Quinones is a risk of flight. Thus, the court should issue an order of detention on this basis.

**B. ENRIQUEZ POSES A DANGER TO THE COMMUNITY**

In addition to being a serious flight risk, there is clear and convincing evidence that Enriquez poses a danger to the community.  This conspiracy involved planning and targeting of an individual on U.S. soil to murder that victim on behalf of a well-known violent cartel. As with Quinones, Enriquez played a vital role in bringing cartel violence to the Southern District of California. And this conduct was entirely consistent with Enriquez past conduct as a Wilmas member and with his criminal history. As discussed above, warrant returns show videos of him and others violently beating people on the street and holding multiple types of guns. The United States also recovered messages from Enriquez indicating that he had taught Nunez how to fight to protect himself in custody. Enriquez's violent tendencies were confirmed at the time of arrest when he told cops he wished he could have run, indicated he wished he could have been shot by them, asked officers if they felt safe as he discussed how detainees could attack law enforcement drivers, and displayed a mentality of having nothing to lose by asking multiple times how he could get the death penalty. In sum, there is clear and convincing evidence that Enriquez poses a danger to the community and should be detained.

//
//
//
//
//

## V.    **CONCLUSION**

For all of these reasons, the United States respectfully requests that the Court grant the United States' Motion for Detention of Quinones and Enriquez.

DATED:  February 12, 2026                    Respectfully submitted,

ADAM GORDON
United States Attorney

/s/ *Ashley E. Goff*
ASHLEY E. GOFF
JOSHUA C. MELLOR
PETER S. HORN
Assistant United States Attorneys